Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 03 C 1455 | DATE | July 30, 2003 |
| CASE TITLE | Continental Casualty Co. v Northwestern National Ins. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Hearing
(5) ☐ Status hearing
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Memorandum opinion and order. Defendant's motion to dismiss is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| X | Notices mailed by judge's staff. | | AUG 04 2003 date docketed | |
| | Notified counsel by telephone. | | | 12 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | | |
| | Copy to judge/magistrate judge. | 03 AUG -1 PM 2:22 | date mailed notice | |
| GDS | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CONTINENTAL CASUALTY COMPANY, an Illinois insurance company, and CONTINENTAL INSURANCE COMPANY, a New Hampshire insurance company,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHWESTERN NATIONAL INSURANCE COMPANY, a Wisconsin insurance company,<br><br>Defendant. | **DOCKETED**<br><br>AUG 0 4 2003<br><br>No. 03 C 1455<br><br>Judge Robert W. Gettleman |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Continental Casualty Company ("CCC") and Continental Insurance Company ("CIC") have brought a one count complaint for declaratory judgment against defendant Northwestern National Insurance Company seeking interpretation of a contract between CCC and defendant. Specifically, plaintiffs are seeking a declaration that a 1996 Commutation & Release Agreement ("Commutation Agreement") cancelled treaty reinsurance agreements between defendant and CCC only, and did not cancel any agreements between CIC and defendant. Defendant has moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted. For the reasons set forth below, defendant's motion is denied.

### FACTS

Plaintiffs are insurance companies with their principle places of business in Illinois. Defendant is an insurance company organized under the laws of Wisconsin with its principle place



of business in Ohio. Defendant is sued in its own right, and as successor of Universal Reinsurance Company, Bellefonte Re Insurance Company, and Bellefonte Insurance Company.

CNA Financial Corporation ("CNA") is an insurance holding company. At all times pertinent to this litigation, CNA has directly owned CCC, which itself owned fifteen to twenty other insurance companies. In 1995, CNA purchased the Continental Corporation, an insurance holding company, which directly owned CIC. As a result, by year end of 1995 CNA owned both CCC and CIC.

According to the complaint, under a reinsurance contract, an insurance company, known as the "ceding company" or "cedent," obtains insurance from another professional insurer, known as the "reinsurer," in order to transfer some or all of the insured risk the cedent has assumed. In the instant case, plaintiffs were cedents and defendant was the reinsurer. Both plaintiffs and defendant agree that reinsurance contracts take two forms. The first type is a "treaty reinsurance agreement," which covers an entire line or segment of the cedent company's business over a period of time. An example is reinsurance covering all directors' and officers' insurance policies issued by the cedent in 2002. The second type of reinsurance agreement is a "facultative reinsurance agreement," which applies to a single policy issued by the cedent and is negotiated on an individual basis. An example is reinsurance covering the specific directors' and officers' insurance policy issued by the cedent to XYZ Corporation on February 1, 2002. Defendant entered into various treaty reinsurance agreements with CCC from the 1960s through the 1980s. Defendant also entered into various facultative reinsurance agreements with CCC and CIC from the 1960s through the 1980s.

In May 1996 CCC and defendant entered into the Commutation & Release Agreement ("Commutation Agreement"), which states in part:

> "This Commutation & Release Agreement is by and between Continental Casualty Company and its affiliates, including but not limited to: American Casualty Company of Reading, PA., CNA Casualty of California, CNA Casualty of Puerto Rico, Columbia Casualty Company, Manufacturers Trust Insurance Company, and Transportation Insurance Company, (hereinafter collectively the "Reinsured") and Northwestern National Insurance Company, individually and as successor to Universal Reinsurance Corporation and Bellefonte Re Insurance Company, formerly Bellefonte Insurance Company, (hereinafter collectively the "Reinsurer")."

CIC is not listed as an affiliate, and plaintiff denies that CIC was an affiliate of CCC at the time the Commutation Agreement was executed.

The Commutation Agreement states in the first recital that, "the Reinsured and Reinsurer are parties to the Treaty Reinsurance Agreements listed in Schedule A," and then defines the term "Reinsurance Agreements" to be read "Treaty Reinsurance Agreements listed in Schedule A." (A copy of the front two pages from Schedule A is appended to this opinion.) The second recital states that, "the Reinsured and the Reinsurer now desire to fully and finally settle and commute all their respective past, present, and future obligations and liabilities, known and unknown, under the Reinsurance Agreements." Defendant claims that the Commutation Agreement included both the insurance agreements listed in Schedule A under the subtitle "Through Direct Placement With Intermediary" and the insurance agreements listed under the subtitle "Through Facultatively Placed." Plaintiff claims that the Commutation Agreement cancelled only the list under "Through Direct Placement With Intermediary" and did not cancel facultative reinsurance agreements under which defendant owes CIC $2.6 million billed by CIC under facultative reinsurance agreements defendant issued to CIC and other insurance companies owned by the Continental Corporation.

3

## DISCUSSION

Defendant has moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for "failure to state a claim upon which relief can be granted." A complaint should not be dismissed for failure to state a claim unless there is no doubt that the plaintiff cannot prove a set of facts that would entitle him to relief based on his claim. *Pressalite Corp. v. Matsushita Electric Corp. of Am.*, 2003 WL 1811530 at *2 (N.D.Ill Apr. 4, 2003). When a motion to dismiss is considered, the court accepts the allegations of the complaint as true and views the facts in the light most favorable to the plaintiff. *Travel All Over the World Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1428 (7th Cir. 1996).

When a court interprets a contract, it must first decide if the contract is ambiguous. *ABT v. Mazda American Credit*, 25 F.Supp.2d 860, 862 (N.D.Ill. 1998). In Illinois, "a contract is ambiguous only if the language used is reasonably or fairly susceptible to having more than one meaning, but is not ambiguous if a court can discover its meaning simply through knowledge of those facts which give it meaning as gleaned from the general language of the contract." *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998). Additionally, a contract is not construed as ambiguous simply because the parties do not agree on the meaning of the terms. *Id.* If there are questions, however, that cannot be answered by reading the contract, extrinsic evidence is necessary to determine the intent of the parties, and a motion to dismiss cannot be granted. *Great Oak, LLC. V. Begley Co.*, 2003 WL 880994 *3 (N.D.Ill. Mar. 5, 2003).

The Commutation Agreement states that CCC and its affiliates and defendant are no longer bound to the treaty reinsurance agreements listed under Schedule A of the agreement. The first issue that is disputed is whether plaintiffs are affiliates and are both bound by the Commutation Agreement, or if only CCC is bound.

4

Defendant asserts that the Commutation Agreement binds both CCC and CIC, because the Commutation Agreement states it is between defendant on the one hand, and CCC and its "affiliates" on the other hand. The question is whether CIC was an affiliate of CCC at the time the Commutation Agreement was executed because, as alleged in the complaint, CCC and CIC's parent were both owned by CNA Financial Corporation. To establish that they were affiliates, defendant relies on the definition of affiliate set forth in *Allendale Mutual Insurance Company v. Bull Data Systems, Inc.*, 1994 WL 710771 (N.D.Ill. Dec. 16, 1994). *Allendale* discussed how the term affiliate, using Illinois law, should be interpreted in an insurance policy. *Id.* at 7.

The *Allendale* court examined several sources for the definition of "affiliate": (1) *Black's Law Dictionary*: "a company effectively controlled by another company;" (2) *The Oxford English Dictionary*: "united in a dependent relation as branches of a society to the central organization;" and (3) *Random House Dictionary of the English Language*: "a business concern owned or controlled in whole or in part by another concern." *Id.* at 7-8. The Illinois Insurance Code, 215 ILCS 5/131.1(a), cited by both *Allendale* and defendant, states, "an 'affiliate' of or person 'affiliated' with, a specific person, is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified." The *Allendale* court concluded that there were two possible interpretations of affiliate. *Id.* Consistent with Illinois law, which requires construction of ambiguous terms of insurance agreements to be construed in favor of the insured, the *Allendale* court construed the term affiliates to mean common ownership. *Id.* Under this definition, CIC and CCC were affiliates at the time the Commutation Agreement was entered. In the instant case, however, neither party is the "insured" and, therefore, acceptance of the *Allendale* definition is not necessarily required.

5

Recently, Judge Hibbler addressed the issue in *Chillmark Partners, LLC v. MTS Inc.*, 2003 WL 1964408 (N.D.Ill. Apr. 25 2003), a case more closely related to the instant case than *Allendale*. Chillmark and MTS entered into a contract, interpreted under Illinois law, that was to be between Chillmark and MTS, "together with any subsidiaries and affiliates." The agreement did not name any affiliates or subsidiaries, nor did it define those terms. Chillmark argued that various defendants were parties to the contract because they were subsidiaries or affiliates of MTS. *Id.* Judge Hibbler concluded that the terms were not ambiguous and applied the common definition found in *Black's Law Dictionary 59 (7th ed. 1999)*, which states, "an affiliate is a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." *Id.* at 3. Although the various defendants in *Chillmark* were related to MTS as shareholders, the court held they were not affiliates because they were not corporations. *Id.* at 4.

The instant case is comparable to *Chillmark* because it also involves a contract between two companies (as opposed to a contract for insurance between an insurer and insured) that is interpreted under Illinois law. Moreover, the Commutation Agreement, like the contract in *Chillmark*, does not define the term "affiliate." Based on the definition used in *Chillmark*, CIC and CCC are affiliates because they are sibling corporations related to another corporation, CNA. Thus, using either the *Allendale* or *Chillmark* definition, under Illinois law, CIC and CCC were affiliates at the time the Commutation Agreement was executed.

Plaintiffs attempt to rely on *Travelers Indem. Co. v. U.S.*, 543 F.2d 71 (9th Cir. 1976), for a narrower definition of affiliate. The court in *Travelers* defined affiliated companies as having an intimate business relationship consisting of an integration of financial and managerial control, and that common ownership alone is not enough. *Id.* at 76. The relationship between the alleged

affiliates in *Travelers*, however, was less significant than the one between plaintiffs in the instant case. The companies in *Travelers* did not have a common owner and were linked only because they planned to operate an electric power transmission system together. *Id.* at 73. Outside of this link, the companies operated individually. *Id.* Additionally, *Travelers* is a Ninth circuit case that did not interpret Illinois law. Therefore, *Travelers* is inapplicable. The court concludes that under Illinois law plaintiffs were affiliates, and the Commutation Agreement binds them both.

The court now turns to the meaning of the Commutation Agreement. Defendant argues that the Commutation Agreement is a clear and unambiguous contract that binds both plaintiffs, and releases defendant from all agreements listed in Schedule A, including any facultative reinsurance agreements. Plaintiffs argue that the Commutation Agreement commuted only the treaty reinsurance agreements in Schedule A, and that defendant is still liable under the facultative reinsurance agreements.

The Commutation Agreement provides, quite clearly, that the "reinsurance agreements," defined as the "<u>treaty</u> reinsurance agreements listed in Schedule A" (emphasis added), were released under the terms of the Commutation Agreement. There is no ambiguity in the text of the Commutation Agreement itself. The problem arises because the first two pages of Schedule A are divided into two parts: (1) "Through Direct Placement with Intermediary," listing a number of treaties by number, "program," "layer," and "Eff." (apparently meaning effective date); and (2) "Through Facultatively Placed," listing thereunder only one entry: "0709 Bellefonte Reins." From this, defendant argues that Exhibit A, (and therefore the reinsurance agreements released by the Commutation Agreement), encompass both the treaty reinsurance agreements and the facultative reinsurance agreements issued by defendant's predecessor Bellefonte ReInsurance Company.

7

The problem with defendant's interpretation is that these pages of Exhibit A can be read to "list" only the treaty insurance programs, which both parties agree refer to the entire line or segment of the cedent's (plaintiff's) business. Thus, only the treaty agreements appear to be listed by number, program, layer, and effective date. The second part of the first two pages of Schedule A, "Through Facultatively Placed," identifies only the reinsurance company by name (Bellefonte) and company number (0709). Because, as discussed above, facultatively place reinsurance is broken down policy by policy, the reinsurance agreements covered by the facultatively placed reinsurance through Bellefonte ReInsurance Company do not appear to be "listed" in Schedule A.

On the face of the complaint, therefore, plaintiff has stated a claim upon which relief can be granted if the court adopts the interpretation discussed above. It is quite possible, however, with the benefit of extrinsic evidence to explain this apparent ambiguity in Schedule A that a different interpretation of the first two pages of that schedule could ultimately be adopted by the court. Thus, the existence of this ambiguity compels denial of defendant's Rule 12(b)(6) motion to dismiss on the face of the complaint.

Defendant additionally asserts that it is entitled to reasonable costs based on plaintiffs' alleged breach of paragraph 5 of the Commutation Agreement by filing this suit. Paragraph 5 states that upon payment of the sum due, neither party will file suit against the other "in respect of any matters relating to or arising out of the Reinsurance Agreements." Because the instant case arises from the Commutation Agreement rather than the Reinsurance Agreements, however, paragraph 5 does not apply.

## CONCLUSION

For the reasons stated herein, the court concludes that the Commutation and Release Agreement on its face is ambiguous and cannot be interpreted without further evidence. Plaintiff has stated a claim upon which relief could be granted. Defendant's motion to dismiss is denied.

**ENTER:** July 30, 2003

**Robert W. Gettleman**
**United States District Judge**

**Schedule A - Part 1**
REINSURER: BELLEFONTE RE INSURANCE COMPANY
COMPANY #: 0709

| TREATY | PROGRAM | LAYER | EFF. |
|---|---|---|---|

THROUGH DIRECT PLACEMENT WITH INTERMEDIARY

| TREATY | PROGRAM | LAYER | EFF. |
|---|---|---|---|
| 1886 | CASUALTY UNDERLYING | SECOND EXCESS | 10/1/75 |
| 1941 | COLUMBIA CASUALTY | THIRD EXCESS | 1/1/77 |
| 1951 | CASUALTY UNDERLYING | SECOND EXCESS | 1/1/77 |
| 1954 | GLOBAL | THIRD EXCESS | 1/1/77 |
| 2024 | GLOBAL | THIRD EXCESS | 1/1/78 |
| 2040 | REINS DEPT-CASUALTY FAC | FIRST EXCESS | 7/1/78 |
| 2040 | REINS DEPT-CASUALTY FAC | FIRST EXCESS | 1/1/80 |
| 2040 | REINS DEPT-CASUALTY FAC | FIRST EXCESS | 1/1/81 |
| 2067 | GLOBAL | THIRD EXCESS | 1/1/79 |
| 2127 | GLOBAL | THIRD EXCESS | 1/1/80 |
| 2127 | GLOBAL | THIRD EXCESS | 1/1/81 |
| 2134 | COLUMBIA CASUALTY | THIRD EXCESS | 1/1/80 |
| 2199 | COLUMBIA CASUALTY | THIRD EXCESS | 1/1/81 |

THROUGH FACULTATIVELY PLACED

| 0709 | BELLEFONTE REINS | | |
|---|---|---|---|

Contracts commuted include all underwriting periods whether specifically listed or not.

9

Schedule A - Part 1
REINSURER: BELLEFONTE RE INSURANCE COMPANY
COMPANY #: 0709

| TREATY PROGRAM | LAYER | EFF. |
|---|---|---|
| THROUGH DIRECT PLACEMENT WITH INTERMEDIARY | | |
| 1886 CASUALTY UNDERLYING | SECOND EXCESS | 10/1/75 |
| 1941 COLUMBIA CASUALTY | THIRD EXCESS | 1/1/77 |
| 1951 CASUALTY UNDERLYING | SECOND EXCESS | 1/1/77 |
| 1954 GLOBAL | THIRD EXCESS | 1/1/77 |
| 2024 GLOBAL | THIRD EXCESS | 1/1/78 |
| 2040 REINS DEPT-CASUALTY FAC | FIRST EXCESS | 7/1/78 |
| 2040 REINS DEPT-CASUALTY FAC | FIRST EXCESS | 1/1/80 |
| 2040 REINS DEPT-CASUALTY FAC | FIRST EXCESS | 1/1/81 |
| 2067 GLOBAL | THIRD EXCESS | 1/1/79 |
| 2127 GLOBAL | THIRD EXCESS | 1/1/80 |
| 2127 GLOBAL | THIRD EXCESS | 1/1/81 |
| 2134 COLUMBIA CASUALTY | THIRD EXCESS | 1/1/80 |
| 2199 COLUMBIA CASUALTY | THIRD EXCESS | 1/1/81 |
| THROUGH FACULTATIVELY PLACED | | |
| 0709 BELLEFONTE REINS | | |

Contracts commuted include all underwriting periods
whether specifically listed or not.