| United States District Court, Northern District of Illinois | | | | |
|---|---|---|---|---|
| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | | |
| CASE NUMBER | 03 C 1455 | DATE | August 31, 2004 | |
| CASE TITLE | Continental Casualty Co. v Northwestern National Ins. | | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

DOJune 14, 2004CKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Hearing
(5) ☐ Status hearing
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Memorandum opinion and order entered. Accordingly, plaintiffs' motion for summary judgment is granted and defendant's motion for summary judgment is denied. This court holds and enters declaratory judgment for plaintiffs and against defendant that the Commutation Agreement commutes only three facultative certificates totaling $22,783.35.

(11) ☐ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| X | Notices mailed by judge's staff. | | SEP 0 3 2004 | |
| | Notified counsel by telephone. | | date docketed | 55 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| GDS | courtroom deputy's initials | 2004 SEP -2 PM 1:01 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CONTINENTAL CASUALTY COMPANY, an Illinois insurance company, and CONTINENTAL INSURANCE COMPANY, a New Hampshire insurance company,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHWESTERN NATIONAL INSURANCE COMPANY, a Wisconsin insurance company,<br><br>Defendant. | No. 03 C 1455<br><br>Judge Robert W. Gettleman |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Continental Casualty Company ("CCC"), and Continental Insurance Company ("CIC"), filed a one count complaint for declaratory judgment against defendant Northwestern National Insurance Company, seeking interpretation of a contract between CCC and defendant. Specifically, plaintiffs seek a declaration that a 1996 Commutation & Release Agreement ("Commutation Agreement") cancelled reinsurance agreements between defendant and CCC only, and did not cancel any agreement between CIC and defendant. Both plaintiffs and defendant have moved for summary judgment pursuant to Fed. R. Civ. P. 56(c). For the reasons set forth below, plaintiffs' motion for summary judgment is granted and defendant's motion for summary judgment is denied.

## FACTS

Plaintiffs CCC and CIC are insurance companies with their principle places of business in Illinois. Defendant is an insurance company organized under the laws of Wisconsin, with its principal place of business in Ohio.

CNA Financial Corporation ("CNA") is an insurance holding company. At all times pertinent to this litigation, CNA has directly owned CCC, which itself owns fifteen to twenty other insurance companies. On May 10, 1995, CNA purchased the Continental Corporation, an insurance holding company that directly owned CIC. As a result, by the end of 1995 CNA owned both CCC and CIC.

Under a reinsurance contract, an insurance company, known as the "ceding company" or "cedent," obtains insurance from another professional insurer, known as the "reinsurer," to transfer some or all of the insured risk the cedent has assumed. In the instant case, plaintiffs were cedents and defendant was the reinsurer. Reinsurance contracts take two forms, the first of which is a "treaty reinsurance agreement," which covers an entire line or segment of the cedent company's business over a period of time. The second type of reinsurance agreement is a "facultative reinsurance agreement," which applies to a single policy issued by the cedent and is negotiated on an individual basis. Defendant entered into various treaty reinsurance agreements with CCC from the 1960s through the 1980s. Defendant also entered into various facultative reinsurance agreements with both CCC and CIC from the 1960s through the 1980s.

In May 1996 CCC and defendant entered into the Commutation Agreement, which states in the first recital, "the Reinsured and Reinsurer are parties to the Treaty Reinsurance Agreements listed in Schedule A," and then defines the term "Reinsurance Agreements" as "Treaty Reinsurance Agreements listed in Schedule A." Because "Reinsured" is defined as CCC and all of its affiliates, and CIC was affiliated with CCC at that time, this court has already held that CCC is bound by the agreement. Continental Cas. Co. v. Northwestern Nat'l Ins. Co., 03 C 1455, 2003 WL 2181022 (N.D. Ill. Aug. 4, 2003). The second recital states that, "the Reinsured

2

and the Reinsurer now desire to fully and finally settle and commute all their respective past, present, and future obligations and liabilities, known and unknown, under the Reinsurance Agreements." In Schedule A - Part 1, under the heading of "Through Facultatively Placed," is the term "0709 Bellefonte Reins."

The negotiations for the Commutation Agreement were conducted by CNA account executive Zina Cornelius ("Cornelius"), and defendant's President and CEO, Jack Diers ("Diers"). Patricia Henson, a manager in the finance department at defendant, assisted Diers throughout the negotiations. At the time of the negotiations, which was shortly after CNA purchased Continental and thus acquired CIC, CIC's records and information had not yet been integrated into CNA's computer accounting system. At that time CNA was beginning to switch to a new computer accounting system, but the conversion had not yet taken place. CIC's reinsurance information was not integrated into CNA's new accounting system until late November 1996. "0709" was an identifier used by CCC in CNA's old accounting system for identifying Bellefonte Reinsurance Company ("Bellefonte").

On October 2, 1995, Cornelius faxed Diers a list of balances owed by defendant, broken down by the original insurer. On the page for Bellefonte, under "Through Facultatively Placed," the bottom left of the page says "070 Bellefonte Reins." which the parties agree is meant to say "0709." The amount listed for this is $22,783.35 under the column "Paid Losses." This is the total for three facultative claims issued under Bellefonte: 1) Chanslor-Western in the amount of $21,158.88; 2) the University of PGH in the amount of $1,526.07; and 3) an unnamed insured in the amount of $98.40. On December 14, 1995, Cornelius faxed Diers an offer to commute the balances detailed in the fax. Again, on the listings for Bellefonte, under the heading "Through

Facultatively Placed," is the listing "070 Bellefonte Reins." and the monetary value of $22,783.35. A fax from December 28, 1995, indicates the same thing, only with the inclusion of an Included But Not Reported ("IBNR") figure of $7,850.00. IBNR is a term used to describe liability for future payments on losses that have already occurred but have not yet been reported in the reinsurer's records. Schedule A – Part 1 of the final version of the Commutation Agreement contains the nearly identical listing for Bellefonte, with the exception that there is no listing of a monetary value on the line "0709 Bellefonte Reins."

Teresa Scott, a claims manager for defendant at the time of the negotiations, was responsible for carrying out defendant's commutation booking. If a facultative certificate was being commuted, Scott would notify an employee in the actuary department to place a "C" indicator in the Universal Reinsurance System ("URS"), defendant's software system. On October 17, 2001, there were still claims on CIC facultative certificates in the URS without the "C" indicator to show that they had been commuted. Defendant did not take down or remove from its books and the URS, reserves on claims made against CIC facultative certificates until at least the fall of 2001.

In 2000, CNA and defendant attempted to commute all facultative certificates issued by defendant to CIC and CCC. Defendant provided information on 70 facultative certificates in its system, but ultimately could not provide enough information on all the certificates it wished to commute, and negotiations "never got off the ground."

Defendant argues that the Commutation Agreement included both the insurance agreements listed in Schedule A- Part 1 under the subtitle "Through Direct Placement With Intermediary," and the insurance agreements listed under the subtitle "Through Facultatively

4

Placed," including all CIC facultative agreements with defendant. Plaintiffs initially argue that the Commutation Agreement cancelled only the list under "Through Direct Placement With Intermediary," and did not cancel facultative reinsurance agreements. In the alternative, plaintiffs argue that the Commutation Agreement cancelled only three facultative certificates issued by Bellefonte to CCC. In either case, plaintiffs argue that the agreement did not commute all facultative agreements, under which defendant owes CIC $2.6 million billed by CIC under facultative reinsurance agreements defendant issued to CIC and other insurance companies owned by the Continental Corporation.

## SUMMARY JUDGMENT STANDARD

A movant is entitled to summary judgment under Fed. R. Civ. P. 56 when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set for specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Becker v. Tenenbum-Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonable find for the [nonmoving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## DISCUSSION

The issue before the court is one of contract interpretation. The problem arises because Schedule A – Part 1 has two separate listings: (1) Through Direct Placement With Intermediary," listing a number of treaties by "Program," "Layer," and "Eff." (apparently meaning effective date); and (2) "Through Facultatively Placed," listing only one entry: "0709 Bellefonte Reins." The entire case hinges on the interpretation of the words "0709 Bellefonte Reins." Plaintiffs argue that no facultative agreements are commuted by the language in the agreement; "0709 Bellefonte Reins." does not "list" any facultative agreements by "Program," "Layer," and "Eff." Defendants argue to the contrary that the Commutation Agreement unambiguously commutes all facultative agreements issued by Bellefonte with respect to plaintiffs.

"Under Illinois law, if a contract is ambiguous, its interpretation is a question of law for the court as long as the extrinsic evidence bearing on the interpretation is undisputed." Baker v. America's Mortgage Servicing, Inc., 58 F.3d 321, 326 (7th Cir. 1995) (citations omitted). "Ambiguity exists where a term is one that is reasonably and fairly susceptible to more than one meaning." Id. The Commutation Agreement offers no definition for "0709," and is therefore ambiguous on its face as to the meaning of "0709 Bellefonte Reins."

Defendant cites to Mid Century Ins. Co. v. American Centennial Ins. Co., 108 F.3d 1385 (Table), 1997 WL 120712 (9th Cir. 1997), an unpublished Ninth Circuit opinion, to support its assertion that the Commutation Agreement is a global commutation. The rules of both the Seventh and Ninth circuits largely proscribe citations to unpublished opinions except in certain circumstances. Specifically, except for purposes of res judicata, collateral estoppel, or law of the case, no unpublished opinion of any court may be cited in the Seventh Circuit if citation is

6

prohibited in the rendering court. Seventh Cir. R. 53(e), (b)(2)(iv) (2004). Except under circumstances not applicable here, the Ninth Circuit forbids citations to unpublished opinions. Ninth Cir. R. 36-3(b) (2004). Defendant makes no argument to the contrary in its reply.

Regardless, the facts in Mid Century are readily distinguishable from this case. In Mid Century, the commutation agreement commutes "numerous reinsurance agreements" between the reinsured and the reinsurer. Mid Century, 108 F.3d 1385, 1997 WL 120712, at *2. There was no "list" of agreements at issue. In light of the context of the entire agreement, the court interpreted "numerous" to mean a global commutation. Mid Century also stated that if the plaintiffs had desired to keep their facultative certificates out of the agreement, they should have specifically done so. Id. at *3. There is no problem of specificity in the instant case. The Commutation Agreement unequivocally seeks to commute only those "Treaty Reinsurance Agreements listed in Schedule A." Again, "0709 Bellefonte Reins." is the relevant term at issue.

"In construing the provisions of a contract the court's primary objective is to give effect to the intent of the parties at the time the contract was made." Kaplan v. Shure Bros., Inc., 266 F.3d 598, 604 (7th Cir. 2001) (citation omitted). The question then is the parties' intent with respect to the term "0709 Bellefonte Reins." Defendant argues that the parties intended to globally commute facultative certificates issued by Bellefonte to all CNA entities, including CCC and CIC. Specifically, defendant argues that Diers considered CIC when negotiating the agreement, and further that plaintiffs' failure to place exclusionary language in the Agreement evinces intent to commute all facultative certificates between CNA and Bellefonte, therefore including CIC. Plaintiffs, however, argue that the parties intended to commute only three facultative certificates issued by Bellefonte to CCC.

7

Faxes between Cornelius and Diers during the negotiation process unequivocally support plaintiffs' position. On October 2, 1995, December 14 1995, and December 28, 1995, respectively, Cornelius detailed the materials to be commuted in nearly the identical format as the Commutation Agreement. The October 2, 1995, fax lists "outstanding receivables by claims for Bellefonte, Universal Re., and Northwestern National Insurance Companies." Under "Through Facultatively Placed," is the term "070 Bellefonte Reins." with $22,783.35 in the "Paid Losses" column. This value corresponds with the summation of three claims listed on the next page for facultative claims issued under Bellefonte: 1) Chanslor-Western in the amount of $21,158.88; 2) the University of PGH in the amount of $1,526.07; and 3) an unnamed insured in the amount of $98.40. The December 14, 1995, fax contains nearly the identical listing for Bellefonte, with the addition of IBNR as a heading for the final column. Again, "070 Bellefonte Reins." lists $22,783.35 in the "Paid Losses" column. The values under the "Reserves" and "IBNR" columns are both zero. The next page again lists facultative claims issued under Bellefonte, but here someone, presumably Cornelius or Diers, has written "Fac" beside the values for Chanslor-Western, The University of PGH, and the unnamed insurer. Correspondingly, the three values, $21,158.88, $1,526.07, and $98.40, are added up by hand at the bottom of the page to the sum of $22,783.35. Lastly, in the December 28, 1995, fax "709 Bellefonte Reins." lists $22,783.35 in the "Paid Losses" column, and lists "$7,850" in the "IBNR" column. These faxes clearly show that Diers and Cornelius were not contemplating a global commutation of all Bellefonte's facultative certificates, totaling in the millions of dollars, but rather intended to commute only specifically identified facultative certificates. These faxes also refute defendant's

argument that the failure to exclude CIC facultative agreements necessarily includes them; the parties were obviously focusing on three particular agreements, all of which were with CCC.

Defendant argues that the inclusion of the IBNR value of $7,850 indicates a global commutation. Specifically, defendant argues that IBNRs are extremely difficult to calculate for facultative contracts, and would require a large pool of contracts, hence indicating more than the commutation of three facultative certificates. Plaintiffs respond that that this was the estimated IBNR for those three claims. While the parties dispute this point, the Commutation Agreement did not include any IBNR for facultative reinsurance agreements. Either way, no reasonable person would consider the introduction of an IBNR of $7,850 as an offer to commute 2,200 facultative certificates between Bellefonte and CIC worth at least $2,990,000. There was no "unilateral mistake" by plaintiffs in failing to consider the scope of the agreement; all the material evidence shows that both parties meticulously considered and narrowly tailored the scope of agreement. While Henson says that Diers considered the CNA merger and therefore CIC material, that "fact" is in no way dispositive. The negotiations explicitly and repeatedly detailed "0709 Bellefonte Reins." as three Bellefonte facultative agreements for commutation, totaling $22,783.35.

Plaintiffs also argue that defendant's behavior after the execution of the Commutation Agreement shows that CIC agreements were not intended as part of the commutation. Under Illinois law, course of performance is admissible to help resolve an ambiguity in an agreement and "may be used to interpret the intent of the parties, since such evidence likely reflects the parties' understanding of their agreement." Kinesoft Dev. Corp. v. Softbank Holdings Inc., 139 F. Supp. 2d 869, 890-91 (N.D. Ill. Feb. 16, 2001) (citations omitted). Defendant did not follow

its typical procedure for commutation as if CIC reinsurance was included in the Commutation Agreement. Specifically, as late as October 17, 2001, there were claims on CIC facultative certificates still in the URS without the "C" indicator to show that they had been commuted. Also, defendant did not take down or remove from its books and the URS reserves on claims made against CIC facultative certificates until at least the fall of 2001. Although defendant characterizes these actions as "inadvertent error[s]," in light of the faxes between Diers and Cornelius, these actions are consistent with the conclusion that both parties believed that the Commutation Agreement did not encompass CIC facultative agreements.

Plaintiffs also correctly note that defendant's later negotiations with CNA for a commutation agreement demonstrate defendant's understanding that the 1996 agreement was not a global commutation. In June 2000, CNA and defendants began negotiating a commutation of facultative agreements. Defendant expressed interest in commuting all 2,200 facultative certificates at issue with CNA, which included certificates between Bellefonte and CIC. It necessarily follows that defendant would not have considered entering into a commutation agreement for facultative certificates that had already been commuted. Again, defendant's course of performance demonstrates its understanding that the Commutation Agreement did not commute all facultative agreements between plaintiffs and Bellefonte.

## CONCLUSION

For the reasons stated herein, plaintiffs' motion for summary judgment is granted and defendant's motion for summary judgment is denied. Accordingly, this court holds and hereby enters declaratory judgment for plaintiffs Continental Casualty Company and Continental Insurance Company and against defendant Northwestern National Insurance Company that the
10

Commutation Agreement commutes only those three facultative certificates issued under Bellefonte Reinsurance Company totaling $22,783.35: Chanslor-Western in the sum of $21,158.88; University of PGH in the sum of $1,526.07; and an unnamed insured in the sum of $98.40.

**ENTER:** **August 31, 2004**

　　　　　　　　　　　　　　　　　　　　　　　*[signature]*
　　　　　　　　　　　　　　　　　　　　　　　**Robert W. Gettleman**
　　　　　　　　　　　　　　　　　　　　　　　**United States District Judge**