CERTIFIED COPY

In the

# United States Court of Appeals

## For the Seventh Circuit

No. 04-3560

FILED

NOV 1 6 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

CONTINENTAL CASUALTY COMPANY and
CONTINENTAL INSURANCE COMPANY,

*Plaintiffs-Appellees,*

*v.*

NORTHWESTERN NATIONAL INSURANCE COMPANY,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03-C-1455—Robert W. Gettleman, *Judge.*

---

ARGUED SEPTEMBER 15, 2005—DECIDED OCTOBER 25, 2005

---

Before FLAUM, *Chief Judge,* and RIPPLE and KANNE,
*Circuit Judges.*

FLAUM, *Chief Judge.* Continental Casualty Company
("CCC") and Continental Insurance Company ("CIC")
brought a declaratory judgment action against Northwest-
ern National Insurance Company ("NNIC"), seeking to
clarify a 1996 Commutation and Release Agreement
("Agreement"). CCC and CIC are insurance companies.
NNIC is also an insurance company, which provides

reinsurance. NNIC's predecessor, Bellefonte Insurance Company ("Bellefonte"), entered into various reinsurance contracts with CCC and CIC from the 1960s to the 1980s, under which Bellefonte assumed the risks insured by CCC and CIC. NNIC assumed responsibility for those contracts. In 1996, CCC and NNIC negotiated to commute some of these contracts. The parties disagree as to which reinsurance contracts the 1996 Agreement commuted. CCC and CIC maintain that the Agreement covered three specific reinsurance contracts between CCC and NNIC, and those three contracts only. NNIC argues, however, that the Agreement also commuted all reinsurance contracts between NNIC and CIC. Before the district court, CCC and CIC moved for summary judgment and NNIC filed a cross motion for summary judgment. The district court granted CCC and CIC's motion and denied NNIC's cross motion. NNIC appeals. For the following reasons, we now affirm.

## I. Background

CCC and CIC are both owned by CNA Financial Corporation ("CNA"), an insurance holding company. During all periods relevant to this litigation, CNA has directly owned CCC. CNA purchased the Continental Corporation, which directly owned CIC, on May 10, 1995. NNIC is an insurance company that provides reinsurance contracts.

Under a reinsurance contract, an insurance company, known as the "reinsurer," sells insurance to another insurance company, known as the "ceding company," "cedent," or "reinsured," covering some or all of the insured risk for which the cedent is responsible. There are two types of reinsurance contracts: "treaty reinsurance agreements," which cover an entire line or segment of the cedent company's business over a specified period of time, and "facultative reinsurance agreements," which apply to a

3

single policy issued by the cedent and are negotiated on an individual basis.

From the 1960s to the 1980s, Bellefonte and CCC entered into various treaty reinsurance agreements and facultative reinsurance agreements. During this period, Bellefonte and CIC also entered into various facultative reinsurance agreements. NNIC, as Bellefonte's successor in interest, assumed these reinsurance agreements.

In May 1996, CCC and NNIC agreed to commute certain reinsurance agreements. Jack Diers, NNIC's President and CEO at the time of the transaction and NNIC's signatory to the Agreement, and Zina Cornelius, CNA's Account Executive, negotiated the deal. Under the Agreement, NNIC paid $6.1 million to CCC in exchange for releasing NNIC from its obligations to CCC under certain reinsurance agreements. The Agreement contains a choice of law clause, providing that Illinois law will govern disputes arising out of the Agreement.

The Agreement states in its first recital that "the Reinsured and Reinsurer are parties to the Treaty Reinsurance Agreements listed in Schedule A." The Agreement also states, in the second recital, that "the Reinsured and the Reinsurer now desire to fully and finally settle and commute all their respective past, present, and future obligations and liabilities, known and unknown, under the Reinsurance Agreements." The Agreement defines the term "Reinsured" as CCC and all of its affiliates. Because CIC was affiliated with CCC at the time the Agreement was made, the district court found, in an earlier proceeding that is not at issue in this appeal, that CIC is bound by the Agreement. *Continental Cas. Co. v. Northwestern Nat'l Ins. Co.*, No. 03 C 1455, 2003 WL 21801022 (N.D. Ill. Aug. 4, 2003).

The Agreement defines "Reinsurance Agreements" as "Treaty Reinsurance Agreements listed in Schedule A."

The first two pages of Schedule A are divided into two parts. First, under the title "Through Direct Placement with Intermediary," a number of treaties are listed by number, "program," "layer," and effective date. Second, under the title "Through Facultatively Placed," one entry is listed, "0709 Bellefonte Reins."

The central issue in this appeal is the meaning of the term "0709 Bellefonte Reins." The parties agree that this term is ambiguous. CCC and CIC argued before the district court that only three CCC facultative reinsurance agreements were commuted by the Agreement, because only these agreements were included within the category "0709 Bellefonte Reins." NNIC argued, however, that the Agreement commuted all facultative certificates issued by Bellefonte to all CNA entities, including CCC and CIC.

The district court granted summary judgment in favor of CCC and CIC. NNIC now appeals.

## II. Discussion

We review the district court's grant of summary judgment de novo. *See, e.g., Franklin v. City of Evanston*, 384 F.3d 838, 843 (7th Cir. 2004). We "draw all reasonable inferences from the evidence in the light most favorable to the nonmoving party," NNIC. *Id.* (quoting *Williamson v. Ind. Univ.*, 345 F.3d 459, 462 (7th Cir. 2003)) (internal quotation marks omitted). "This standard applies when cross motions for summary judgment are filed," as they were in this case. *Id.* (citing *Metro. Life Ins. Co. v. Smith*, 297 F.3d 558, 561 (7th Cir. 2002)). To succeed on their motion for summary judgment, CCC and CIC "must show that there is no genuine issue of material fact and that [they are] entitled to judgment as a matter of law." *Id.; see also* FED. R. CIV. P. 56(c). Once CCC and CIC have met this burden, NNIC must show that there is "evidence on which

the jury could reasonably find for" NNIC. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). We are "'not required to draw every conceivable inference from the record,' and 'mere speculation or conjecture' will not defeat a summary judgment motion." *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) (quoting *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1139 (7th Cir. 1997); and *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 591 (7th Cir. 1997)).

Under Illinois law, which controls here because of the Agreement's choice of law clause, it is the general rule that "questions of contractual ambiguity [are given] to the trier of fact, together with the evidence necessary to resolve them." *Kinesoft Dev. Corp. v. Softbank Holdings Inc.*, 139 F. Supp. 2d 869, 891 (N.D. Ill. 2001). An exception to this general rule is that "if a contract is ambiguous, its interpretation is a question of law for the court as long as the extrinsic evidence bearing on the interpretation is undisputed," and summary judgment is therefore appropriate in such cases. *Baker v. America's Mortgage Servicing, Inc.*, 58 F.3d 321, 326 (7th Cir. 1995). In sum, if a reasonable jury could not find for NNIC even when all reasonable inferences are drawn from the undisputed extrinsic evidence, summary judgment is appropriate.

In the underlying proceeding, the district court considered a variety of extrinsic evidence that the parties offered to show the meaning of the ambiguous term "0709 Bellefonte Reins." First, the district court examined facsimiles exchanged by Cornelius and Diers during the negotiation of the Agreement. These three facsimiles, dated October 2, December 14, and December 29, 1995, detail the reinsurance contracts to be commuted and were in "nearly the identical format as the Commutation Agreement." The October 2 facsimile, which the district court determined to be nearly identical to the December 14 and

29 facsimiles, lists "outstanding receivables by claims for Bellefonte, Universal Re., and Northwestern National Companies." The item "070 Bellefonte Reins." (which the parties agree should have read "0709 Bellefonte Reins.") is listed under the heading "Through Facultatively Placed." The "Paid Losses" column across from "070[9] Bellefonte Reins." contains the figure $22,783.35. The district court determined that "[t]his value corresponds with the summation of three claims listed on the next page for facultative claims issued under Bellefonte: 1) Chanslor-Western in the amount of $21,158.88; 2) the University of PGH in the amount of $1,526.07; and 3) an unnamed insured in the amount of $98.40."

The only reasonable inference to draw from these three facsimiles is that the parties intended for the notation "0709 Bellefonte Reins." to indicate the three contracts listed above. Although these facsimiles do not prove unequivocally that NNIC knew that only these three facultative agreements were commuted, they negate NNIC's position that it was unaware completely of what agreements were included in the category "0709 Bellefonte Reins."

Second, the district court considered the importance of an Included But Not Reported ("IBNR") figure of $7,850 that was contained in one facsimile exchanged by Cornelius and Diers during negotiations. An IBNR describes the liability for further payments or losses that have already occurred but have not yet been reported in the reinsurer's records. NNIC argued that the presence of an IBNR in the facsimile indicated that the parties intended a global commutation of all facultative insurance agreements issued by Bellefonte to CNA companies, including CIC, because IBNRs are "extremely difficult to calculate for facultative contracts, and would require a large pool of contracts." However, only one facsimile contained the IBNR figure and the final Agreement does

No. 04-3560                                                    7

not include any IBNR for facultative certificates. NNIC's assertion that the $7,850 IBNR figure shows that the parties intended the Agreement to commute the approximately 2,200 facultative reinsurance contracts between NNIC and CIC is speculation, which we need not accept as true for purposes of summary judgment. *See McCoy*, 341 F.3d at 604.

Third, the district court evaluated CCC and CIC's argument that NNIC's behavior following the execution of the Agreement demonstrated that CIC agreements were not intended as part of the commutation. *Id.* CCC and CIC maintain that NNIC "did not follow its typical procedure for commutation as if CIC reinsurance was included in the Commutation Agreement." When a reinsurance agreement is commuted, NNIC enters a "C" indicator in its electronic records next to claims on that agreement. CCC and CIC point out that "as late as October 17, 2001," there were claims on CIC facultative certificates still in NNIC's computer system without the "C" indicator. NNIC argued below that its failure to enter a "C" by commuted CIC facultative agreements was an "inadvertent error." We need not accept this unsupported assertion. *See McCoy*, 341 F.3d at 604.

Fourth, the district court examined NNIC's later negotiations with CNA for another commutation agreement. The district court noted that in June 2000, CNA and NNIC began negotiating a commutation of facultative agreements, during which NNIC "expressed interest in commuting all 2,200 facultative certificates at issue with CNA, which included certificates between Bellefonte and CIC." The district court concluded that NNIC "would not have considered entering into a commutation agreement for facultative certificates that had already been commuted." We agree with the district court that the only reasonable interpretation of the June 2000 negotiations is that NNIC

believed that the 1996 Agreement had not commuted NNIC's facultative reinsurance agreements with CIC.

Fifth, NNIC argues that the deposition of Patricia Page, a CNA employee, raises a reasonable inference on a material issue and that the district court erred by failing to consider that deposition. Page is responsible for collecting ceded reinsurance. She stated in her deposition that a "piece of cash" received by CNA under the Agreement was applied to one CIC facultative reinsurance agreement. NNIC argues that "[u]nder the terms of the Agreement, CNA was required to apply the commutation payment only to commuted contracts." According to NNIC, CNA's application of a "piece of cash" to a CIC agreement demonstrates that the parties intended the Agreement to commute all CCC and CIC facultative reinsurance contracts.

NNIC fails to provide a reasonable basis for this inference. NNIC does not point to any language in the Agreement showing that the commutation payment could be applied only to commuted contracts. NNIC quotes a term of the Agreement stating that NNIC's $6.1 million payment constitutes "full and final settlement of any and all amounts claims heretofore or hereafter to be due by the Reinsurer to the Reinsured, arising under or in respect to the Reinsurance Agreements," which are defined as "agreements listed in Schedule A." This language shows at most that the Agreement discharged NNIC of liability for those reinsurance contracts commuted by the Agreement. It does not show that CCC was forbidden from applying the commutation payment to contracts that were not commuted or that the parties understood the contract to forbid such an action.

Sixth, NNIC argues that the deposition testimony of CNA's Peter Beresford, which the district court does not address in its opinion, supports its opposition to summary judgment. Beresford, in response to the question "[w]ould

you understand that all facultative reinsurance placed through the CCC pool with Bellefonte reinsurance was commuted?", answered, "Yes." NNIC argues that this answer shows that the parties intended the Agreement to commute all CCC and CIC facultative reinsurance contracts. We disagree. At most, this testimony establishes that the Agreement commuted all CCC facultative reinsurance agreements with Bellefonte—not that the Agreement commuted all CIC facultative reinsurance agreements with Bellefonte. NNIC's inference to the contrary is not reasonable based on Beresford's deposition testimony.

Seventh, NNIC relies on a facsimile between the parties on which Jack Diers, CCC's signatory to the agreement, had written "All assumed Bellefonte Re Fac per Zina C. 1/2/96" under the language "Through Facultatively Placed" and "0709 Bellefonte Reins." The district court did not specifically discuss this piece of evidence. NNIC asserts that Diers' notation shows that Diers understood the Agreement to commute both CCC and CIC facultative reinsurance agreements. This assertion, however, is not supported by Diers' cryptic notation, especially because Diers was not available for deposition.

After reviewing the extrinsic evidence offered by the parties, we agree with the district court that the only reasonable inference that can be drawn is that the parties did not intend for the Agreement to cover any CIC facultative reinsurance contracts.

## III. Conclusion

For the foregoing reasons, the district court's opinion granting CCC and CIC's motion for summary judgment and denying NNIC's motion is AFFIRMED.

10

A true Copy:

     Teste:

No. 04-3560

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*